**INTERNATIONAL AIR INDUSTRIES, INC. and Vebco, Inc., Plaintiffs-Appellants,**

v.

**AMERICAN EXCELSIOR COMPANY, Defendant-Appellee.**

No. 74–1953.

United States Court of Appeals, Fifth Circuit.

Aug. 18, 1975.

Rehearing and Rehearing En Banc Denied Oct. 8, 1975.

Kenneth L. King, El Paso, Tex., for plaintiffs-appellants.

W. Royal Furgeson, Jr., Willaim J. Derrick, El Paso, Tex., for defendant-appellee.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Appellants Vebco, Inc., and International Air Industries, Inc.,[1] filed a complaint in the United States District Court for the Western District of Texas charging AMXCO, Inc.,[2] with a violation of the antitrust laws. A lengthy, complex and seemingly disorganized jury trial was held, resulting in a verdict in AMXCO's favor. Vebco appeals, alleging at least twenty substantive trial errors. We affirm the judgment below.

I.

The facts in this case are heatedly contested. Since the trial below resulted in AMXCO's favor, we consider the facts in a light most favorable to it.

Vebco, Inc., is a New Mexico corporation with its principal place of business in El Paso, Texas. It was incorporated in 1959. Vebco is primarily a distributor of heating and air conditioning equipment, although it does manufacture some products, including handmade evaporative cooler pads. It sells its pads primarily in Arizona, New Mexico, and West Texas.[3]

AMXCO, a subsidiary of Texstar Company, has its principal place of business in Arlington, Texas. It maintains a branch office in El Paso, Texas, and manufactures evaporative cooler pads which it sells throughout the southwestern and far western parts of the United States.

The source of the controversy in this case is the cooler pad, an object made of aspen wood shavings covered with crinoline cloth, used in evaporative air conditioners. Such pads have historically been made by hand, but around 1960 AMXCO achieved a breakthrough in the field and began to produce a machine-made pad. Hand- and machine-made pads are interchangeable in use, but the latter can be produced, transported, and stored more cheaply. Through its technological success and business expansion AMXCO became the world's largest producer of cooler pads.

Vebco and AMXCO have enjoyed a lengthy business relationship. The founder of Vebco, Vernon Britt, began to distribute pads for AMXCO in 1953. Until 1969, with only one short exception, the only pads Vebco distributed were manufactured by AMXCO. By selling AMXCO's pads, Vebco developed a highly successful business and gradually expanded its operations to include a complete line of heating and cooling implements.

Except for direct sales to "national accounts," AMXCO marketed all of its cooler pads through independent distributors such as Vebco. Vebco's primary customers in the El Paso-Las Cruces trade area were discount stores. The only large discount store in the area to which Vebco did not sell cooler pads was K-mart, serviced by Passage Supply, an independent distributor for AMXCO.

Prior to 1969, AMXCO favored its El Paso distributors over its Arizona distrib-

---

1. Although Vebco and International were nominally separate business entities, they operated as one business. Because of the interrelation of the two corporations, they had only one counsel and were treated as one entity for purposes of trial. Therefore, "Vebco" will hereinafter refer to both plaintiffs, unless otherwise indicated.

2. American Excelsior Company was the named defendant in the district court, but during the course of discovery Vebco realized that AMXCO, Inc. was the corporate successor to that company. The defendant-appellant will therefore hereinafter be referred to as "AMXCO".

3. International Air Industries, Inc., was incorporated in 1969 for the purpose of manufacturing evaporative cooler pads and evaporative cooler covers for sale by Vebco. Vebco and International, although separate corporate entities, operated as one business. International ceased operations in 1972 and Vebco took over the manufacturing operation.

utors in freight policy: AMXCO paid freight costs of its El Paso distributors to their customers in Arizona but did not pay the freight costs of distributors in Arizona to their customers in El Paso and Las Cruces. In order to rectify this competitive inequity, AMXCO decided to eliminate the freight pre-payment for its El Paso distributors. When AMXCO adopted a uniform freight policy, Vebco decided to set up its own manufacturing plant for cooler pads. With the aid of three former employees of AMXCO, the owners of Vebco formed a corporation and built a plant to manufacture cooler pads by hand in 1969. Vebco then entered the market as a manufacturer and successfully competed with AMXCO. Later that same year, Southwest Industries was formed. Like AMXCO, Southwest manufactured and marketed machine-made cooler pads. There were also numerous small scale handmade pad manufacturers in the market.

When AMXCO learned that Vebco was manufacturing its own cooler pads, AMXCO terminated its distribution relationship with Vebco. Although it lost customers to Vebco in 1969, AMXCO took no action in regard to price.

In 1970, Vebco expressed considerable concern to AMXCO at the emergence of Southwest as a competitor, particularly since partners in the Vebco manufacturing operation were officers of Southwest. Vebco even tried to induce AMXCO to purchase Vebco or its manufacturing operation. AMXCO agreed to loan the Vebco owners $20,000 to buy out the Vebco principals then involved in Southwest and to pay off Vebco's outstanding indebtedness. The negotiations to purchase Vebco never reached fruition but an agreement was reached whereby AMXCO sold specially packaged pads to Vebco which were offered for sale under Vebco's label, and Vebco sold pumps and parts to AMXCO.

Because the 1970 agreement was profitable for both parties, they agreed to continue the operation in 1971. However, prior to the 1971 selling season, relations between the two companies deteriorated, resulting in the suit before us.

In late January, 1971, Vebco dropped its price to discount houses 5% below the price currently being quoted by both AMXCO and Vebco [4]—to a 14.5% discount below list price. This price cut brought Vebco considerable business, including the very lucrative K-mart account which had previously been serviced by AMXCO's distributor, Passage Supply. The record indicates that AMXCO's distributors complained that they could not effectively compete with Vebco, because the latter manufactured its own pads for distribution.

On March 1, 1971, AMXCO requested Vebco's order for three carloads of pads which Vebco had indicated it would purchase from AMXCO. When Vebco failed to verify its order, AMXCO determined that customers which had previously used AMXCO pads distributed by Vebco would now be serviced by Vebco's own pads. In effect, Vebco was going to compete against AMXCO for its customers rather than distributing its pads. AMXCO then decided to compete directly for the discount trade in the El Paso area.

Based on previous public bids by Vebco and Southwest, and on information received from customers, AMXCO determined that a 25% discount would be competitive in the market. AMXCO then contacted its old customer, K-mart, and at least one other discount house, offering the 25% discount. However, AMXCO salesmen made no sales at the 25% discount, because, unknown to them, Vebco had verified their price and had notified its customers that it, too, would give the 25% discount. Because of the

4. Vebco alleged at trial that it was actually meeting a price which had been quoted by either AMXCO or one of its independent distributors. However, Vebco did not attempt to verify the allegation that AMXCO was offering a lower price and there is no evidence in the record, other than Vebco's allegation, that AMXCO initiated the price cutting.

lack of sales at the 25% discount, and because at least one potential customer had reported that Vebco was selling at near a 50% discount, AMXCO again lowered its price, offering a 32.5% discount. Again, Vebco verified and met this price on March 15, 1971, and AMXCO made no substantial sales.

During this intense period of competition, AMXCO delegated price-setting responsibility in the El Paso market to two of its local employees, Wendell Johnson and June Morris. Carl Gillespie, AMXCO's division manager, continued to make recommendations, and on March 16, 1971, he prepared a memorandum suggesting ways to compete with Vebco and Southwest, which included, as one possible alternative, the option of offering prices in El Paso low enough to insure that Vebco would not profit from competitive sales. On March 17, Gillespie also wrote Morris a letter which contained the statement:

> [I]f we are committed to a program of stunting the possible growth of Vebco and keeping our foot in this quite seizeable cooler pad market, then the real question we have here is just what price do we need to determine as our lowest price level.

Vebco had a great deal of difficulty sustaining a 32.5% discount and on March 29, 1971, Vebco announced to its customers that it would return to the 25% discount. AMXCO subsequently made one sale to K-mart, its prior customer at a 39% discount. After the 1971 season, AMXCO raised its prices, offering discounts from 19 to 25% for the 1972 season.

On May 28, 1971, Vebco initiated this suit, charging AMXCO with a violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act (15 U.S.C. § 13(a)).[5] The complaint was amended on July 28, 1972, to charge, additionally, a violation of § 2 of the Sherman Act (15 U.S.C. § 2).[6] The gravamen of the complaint is that AMXCO unlawfully discriminated in price from 1968 through 1971 and attempted to monopolize the El Paso-Las Cruces cooler pad market, as well as that of the southwestern United States, during the same period. Vebco subsequently supplemented its complaint to include the 1972 cooler pad season.

Vebco alleged damages totaling over $100,000 for the years prior to and including 1971 and $42,000 for 1972. It sought treble damages as provided under the antitrust laws, as well as an injunction against AMXCO's allegedly unlawful behavior.

The record indicates that the dollar value of Vebco's cooler pad sales has increased every year since 1968, with the exception of a slight decline in 1972.[7] Conversely, AMXCO's share of the national cooler pad market has declined steadily since 1969. Vebco conceded at

5. 15 U.S.C. § 13(a) provides in relevant part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

6. 15 U.S.C. § 2 (1973) provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

7. Vebco's share of the El Paso cooler pad market also showed a steady increase from 1968 through 1971, the only years for which market figure percentages were introduced below.

trial that it claimed only lost profits, presumably from keen price competition, rather than lost sales for the years prior to 1971. Indeed, almost all of the allegedly illegal acts of which Vebco complains occurred immediately prior to, or coincidental with, the 1971 cooler pad season. During this season, some of the firms with which Vebco previously dealt purchased pads from AMXCO. Nevertheless, Vebco's cooler pads sales, measured in dollars, and its percentage of the El Paso cooler pad market increased in 1971;[8] indeed, only Vebco's markup on pads decreased.[9]

With respect to the slight decrease in 1972 cooler pad sales, Vebco's president conceded at trial that the decline could easily have been caused by the firm's efforts to improve its manufacturing operation at the expense of its sales program. Likewise, the record reveals that 1972 was a poor season for all cooler pad manufacturers and distributors because of inclement weather.

All in all, the record before us reveals that since 1968, the cooler pad market in El Paso has been extremely competitive. The sales season for cooler pads is quite short and manufacturers must necessarily process orders early. On the other hand, the record indicates that customers intentionally quote lower prices to distributors and manufacturers than have actually been offered by a competitor in the hopes of securing a lucrative offer. Vebco, AMXCO, Southwest, and one other manufacturer continue to vigorously compete in the El Paso market

## II.

 Vebco's primary argument on appeal is that the district court erred in refusing to direct a verdict in Vebco's favor on the Robinson-Patman charge.[10] The district court should grant a motion for a directed verdict only if, considering all the evidence and all reasonable inferences that can be drawn from the evidence in a light most favorable to the non-mover's case, reasonable men could not arrive at a verdict in favor of the non-mover. *Boeing v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969) (en banc). Applying this standard to the case before us, we find that the trial court was correct in refusing to direct a verdict in Vebco's favor.

Section 2(a) prohibits price discrimination between different purchasers of commodities of like grade and quality "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce or to injure, destroy, or prevent competition."[11] The Act was

---

**8.** Vebco kept no separate sales figures for cooler pads prior to the initiation of this law suit. The dollar sales figures cited herein are their estimates of past sales based on a review of their invoices.

**9.** Vebco's markup percentage or "gross margin" (retail price minus the cost divided by the retail price) for cooler pads in the years 1968 through 1972 inclusive, was 12%, 17%, 22%, 13%, and 18% respectively.

**10.** Vebco argues on appeal that while the district court erred in not directing a verdict on the Robinson-Patman claim, its disposition of the Sherman Act count was correct, for the record would not support a directed verdict as to the latter. Such an argument surprises us, for we believe that the basic substantive issues raised by the two statutes (with respect to the primary-line injury in the case of the Robinson-Patman Act) are identical. Vebco's counsel apparently feels that the conditional language of the Robinson-Patman Act ("where the effect of such discrimination *may be* substantially to lessen competition" (emphasis supplied)) implies a lesser evidentiary burden on the plaintiff than is required under the Sherman Act. Under the Robinson-Patman Act, of course, it is not necessary to show *actual damage to competition, it is only* necessary to show that there is a reasonable possibility that the discrimination may have that effect. *See Corn Products Refining Co. v. FTC,* 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945). However, since AMXCO's activities cannot reasonably be viewed as a lessening of competition (see text accompanying notes 21–34 *infra*), then construing the "may be" language is not necessary, *see* Areeda and Turner, Predatory Practices under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697, 727 (1975); *Anheuser-Busch v. FTC,* 289 F.2d 835, 843–44 (7th Cir. 1961).

**11.** The Act is concerned with competitive injury to three groups: competitors of the price discriminator ("primary line"), customers of

primarily aimed at national chains that enter a locality and crush a more efficient local concern by cutting prices below cost and subsidizing local losses with excessive profits gleaned in a non-competitive area. *See* F. Rowe, Price Discrimination under the Robinson-Patman Act 123 (1962). However, Congress did not intend to abolish competition "or so radically to curtail it that a seller would have no substantial right of self-defense against a price raid by a competitor." *Standard Oil Company v. FTC,* 340 U.S. 231, 249, 71 S.Ct. 240, 249, 95 L.Ed. 239 (1951). Thus our goal in applying the Robinson-Patman Act is to maintain active competition—including price rivalry—among the members of the business community.

Encouraging competition while at the same time forbidding anti-competitive behavior calls for considerable care in this case. The facts before us reveal a large entrenched firm with a dominant market share confronted by a fledgling company attempting to enter the same market. Such a situation necessitates the greatest scrutiny on our part, for anti-competitive price cuts by the monopolist could be directed toward driving the new competitor out of the market or disciplining it in order to force it to follow the monopolist's price leadership. On the other hand, we believe that neither the Act nor any social value compels the sheltering of an individual competitor, at the expense of the public interest, from the competitive process. *See* F. Rowe, *supra,* at 130.

■ Vebco claims that AMXCO violated the Act when it sold cooler pads to El Paso customers at prices lower than it sold its pads elsewhere. A price discrimination within the meaning of the Act, of course, is merely a price difference, *FTC v. Anheuser-Busch, Inc.,* 363 U.S. 536, 549, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960), but price discrimination is not illegal per se, *Continental Baking Co. v. Old Homestead Bread Co.,* 476 F.2d 97, 103 (10th Cir. 1973). In order to meet the requirement of an adverse effect upon competition, Vebco claimed that there was considerable diversion of business from Vebco to AMXCO in 1971, and, additionally, that Vebco suffered a reduction in its profit margin because it had to compete with AMXCO.

■ It is settled law that a mere diversion of business from one competitor to another does not signify detriment to competition on the seller level.[12]

The Act is really referring to the effect upon competition and not merely upon competitors. In this respect § 2(a) must be read in conformity with the public policy of preserving competition, but it is not concerned with mere shifts of business between competitors. It is concerned with substantial impairment of the vigor or health of the contest for business, regardless of which competitor wins or loses. . . . Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise. *Anheuser-Busch, Inc. v. FTC,* 289 F.2d 835, 840 (7th Cir. [1961] 1971) (citations omitted). See *Atlas Building Products Co. v. Diamond Block &*

the price discriminator ("secondary line"), customers of the price discriminator's customers ("tertiary line"). Only a primary line injury is alleged in this case, and our comments and conclusions therefore pertain only to such injury.

12. *Anheuser-Busch, Inc. v. FTC,* 289 F.2d 835 (7th Cir. 1961); *Minneapolis-Honeywell Regulator Co. v. FTC,* 191 F.2d 786, 790 (7th Cir. 1951). *See also,* Dixon, *Practice and Procedure Before the Federal Trade Commission,* 9 N.Y.L.F. 31, 36 (1963): "Thousands of firms go into bankruptcy every year without bringing a single tear to the eye of anyone even remotely connected with antitrust enforcement. Where a businessman perishes because of his own inefficiency, i. e., because of his inability to make as good a product, sell it at as low a price, or promote it as effectively as his competitors, his passing is noted without a tremor. Indeed, this is normally a sign that the industry in which he failed is a healthy one in which competition is vigorous enough to weed out marginal operators whose talents and resources should be employed elsewhere."

722

*Gravel Co.,* 269 F.2d 950, 954 (10th Cir. 1959) *cert. denied,* 363 U.S. 843 [80 S.Ct. 1608, 4 L.Ed.2d 1727] (1960); F. Rowe, *supra,* at 122–23.

 Mere loss of profits shows no more than that Vebco was forced to charge a competitive price because it faced competition. Similarly, the large size of the discriminator and even the fact that its sales increased during the period of discrimination would not necessarily make out a case.[13] *Anheuser-Busch, Inc. v. FTC,* 289 F.2d 835, 839, 843 (7th Cir. 1961). It is possible for damage to a single competitor to meet the statutory requirements, *see Borden Co. v. FTC,* 381 F.2d 175 (5th Cir. 1967), but a showing of more than competitive pricing and a shift of customers is necessary. Evidence of certain types of predatory conduct, we feel, would fulfill the requirements.[14]

Coupled with its claims of lost profits and diversion of business, Vebco introduced evidence purporting to show AMXCO's "predatory intent" in order to satisfy the statutory requirements. Of the actions which Vebco alleges evinced AMXCO's predatory intent, the only one meriting extensive comment is the Gillespie memo of March 17, 1971, which Vebco claims was conclusive proof of AMXCO's predatory intent.[15]

Judicial use of the term "predatory intent" is troublesome. Several cases hold that from a finding of certain actions, the trier of fact may infer predatory intent, and from this inference the proscribed inimical effects upon competition in turn may be inferred.[16] However, application of these principles is particularly difficult, for predatory intent has never been clearly defined. Its appearance has been characterized by phrases such as "putting a crimp" into one's competitors,[17] punitively or destructively attacking other firms,[18] and acting vindictively with punitive effect.[19] But any price de-

---

**13.** We do not intimate that all of these criteria necessarily apply to the case before us. For example, the record shows that AMXCO's percentage of the market declined during the relevant period.

**14.** Antitrust cases and literature have indicated that the necessary primary line damage to the competition may be found in the absence of predation if certain none too clearly defined conditions result from the price discrimination. *See Continental Baking Co. v. Old Homestead Bread Co.,* 476 F.2d 97 (10th Cir. 1973); *Atlas Building Products Co. v. Diamond Block & Gravel Co.,* 269 F.2d 950 (10th Cir. 1959), *cert. denied,* 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960); F. Rowe, *supra* at 150–161. We find it difficult to discern the manner by which a firm's legitimately competitive behavior absent acquisition of monopoly power could cause damage to competition. However, we need not address that issue. AMXCO's share of the El Paso cooler pad market declined throughout the relevant period; the market was far more competitive after the discrimination than before it; and Vebco, Southwestern and one other manufacturer continue to exist and even grow as large competitors of AMXCO. These facts indicate that even under those cases finding a violation of the statute in the absence of predation, the requisite damage to competition is not present. *See Continental Baking Co. v. Old Homestead Bread Co., supra; Borden Co. v. FTC,* 381 F.2d 175 (5th Cir. 1967); F. Rowe *supra* at 160–161 and cases cited therein. Consequently, Vebco necessarily rests its case upon a "predatory intent" argument.

**15.** Among the other actions which Vebco claims evinced AMXCO's predatory intent was AMXCO's negotiation to purchase Vebco. Even if we assumed that negotiation to purchase a less efficient competitor is in some circumstances anti-competitive, the record clearly shows that Vebco initiated the negotiations and that AMXCO refused to purchase Vebco. Vebco also contends that AMXCO's decision to discontinue supplying Vebco in 1969 was further evidence of predatory intent. However, at oral argument Vebco's counsel conceded that AMXCO had a legitimate right to terminate its relationship with Vebco because Vebco began to manufacture its own pads in 1969 and therefore operated as AMXCO's competitor.

**16.** *See Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 696, n. 12, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967); *Continental Baking Co. v. Old Homestead Bread Co.,* 476 F.2d 97, 104 (10th Cir. 1973); *Cornwell Quality Tools Co. v. C. T. S. Co.,* 446 F.2d 825, 831 (9th Cir. 1971); *Lloyd A. Fry Roofing Co. v. FTC,* 371 F.2d 277 (7th Cir. 1966).

**17.** *E. B. Muller & Co. v. FTC,* 142 F.2d 511, 517 (6th Cir. 1944).

**18.** F. Rowe *supra* at 149.

**19.** *Anheuser-Busch, Inc. v. FTC,* 289 F.2d 835, 842 (7th Cir. 1961).

crease by a legitimately competitive firm will necessarily have a non-remunerative effect upon other firms in the market, if only by decreasing their profit margins. It is therefore important to clearly indicate the types of business behavior which violate the Act.

In this appeal Vebco seeks a ruling that no reasonable man could fail to believe that AMXCO violated the statute. Vebco's allegations of predatory intent were contested at trial by AMXCO. Therefore, even under the unwieldy "double inference test," Vebco cannot prevail on appeal; the record indicates that the jury would have been justified in finding an absence of "predatory intent," or, upon finding such intent, in failing to draw the permissible inference of damage to competition.

It is possible, of course, for a plaintiff to present evidence of predation sufficient to warrant a directed verdict, but quoting out of context segments of internal company memoranda is simply insufficient. Gillespie's memorandum reveals that AMXCO acted as any legitimately competitive and rational firm would; Gillespie considered Vebco's potential for growth and enumerated several alternatives which AMXCO officials could consider in meeting the new competitive challenge. In order to require a court to direct a verdict, Vebco must adduce evidence of what AMXCO did; at best, it showed only what AMXCO might have done. *See Anheuser-Busch,*

*Inc. v. FTC,* 289 F.2d 835, 843 (7th Cir. 1961).

■ Since the allegedly harmful actions in this case involve pricing, we must examine the relationship between AMXCO's prices and costs in order to determine whether their price behavior was predatory.[20] By "predatory" we mean that AMXCO must have at least sacrificed present revenues for the purpose of driving Vebco out of the market with the hope of recouping the losses through subsequent higher prices.

When a firm sets its price equal to its average cost, its total revenues cover total costs, including normal returns on investment.[21] If a monopolist[22] is selling at a price at or above average cost, but could earn higher profits at a higher price, it may be attempting to deter entry into the field. Likewise a monopolist may attempt to drive out existing competition by temporarily lowering price to average cost. In either case, we believe that a price above average cost is a fairly competitive price for it is profitable to the monopolist if not to its rivals; in effect, the price excludes only less efficient firms. Areeda and Turner, *supra* note 10, at 706–707.

In the case before us, the entry of Vebco and Southwest created excess manufacturing capacity in the cooler pad market.[23] Therefore, AMXCO's marginal cost was almost certainly below its average cost.[24] In such situations we do

**20.** We therefore do not consider other conceivably predatory behavior such as predatory investment or promotional spending.

**21.** *See* Areeda and Turner, *supra* note 10 at 704; P. Samuelson, Economics 447–48 (8th ed. 1970). Much of our discussion in the next few paragraphs is based upon accepted economic analysis. *See e. g.,* P. Samuelson, *supra* at 428–510.

**22.** For the purposes of this discussion a monopolist is one who has captured a sufficiently large part of a market to be able to determine market price by varying its output. *See, e. g., Independent Iron Works, Inc. v. United States Steel Corp.,* 322 F.2d 656, 667 (9th Cir. 1963). We do not use the term to indicate that the firm is a monopolist under the language of the

Sherman Act and hence violating the law by its very existence.

**23.** The record shows that Vebco and Southwest both built factories during the years at issue in this suit. The fact that this new production created excess capacity is also evidenced by an AMXCO memorandum which indicated that every sale Vebco made increased AMXCO's unit costs by idling some of its production facilities.

**24.** *Id.* at 710. If AMXCO's production facilities had been producing beyond the output at which they function most efficiently, AMXCO's marginal costs, the cost of the last unit produced, would exceed its average cost. In such a situation, a reduction of price to marginal cost would still cover all of the compa-

not believe that the monopolist's pricing behavior could be deemed anti-competitive unless the monopolist set a price below its own marginal cost—since any sale at or above marginal cost does not decrease short-run net returns.[25] It may be theoretically possible for a reduction of price to marginal cost by a monopolist to drive out an equally but not more efficient competitor. *Id.* at 711. However, establishing a price floor above marginal cost would permit the survival of far less efficient firms. Certainly, forcing a monopolist to charge a price higher than marginal cost could reduce industry output and waste economic resources in the short-run.[26]

It is frequently quite difficult to calculate the incremental cost of making and selling the last unit (i. e., marginal cost) from a conventional business account. *Id.* at 716. Consequently, the firm's average variable cost[27] may be effectively substituted for marginal cost in predatory pricing analysis. *Id.* at 717–18. Thus, a firm's pricing behavior can be considered anti-competitive when it sells at a price below its average variable cost.[28]

When price discrimination exists—as in the case before us—we see no reason to depart from the average variable cost test for predation unless it can be shown that there are significant barriers of entry into the relevant market. Thus, even if a monopolist is price discriminating, we will not infer damage to competition as a matter of law if the firm is charging a short-run, profit-maximizing price (above average variable cost) in the market in which it faces competition. And, even if its price is below this level, we will not infer damage to competition if the firm's price discrimination has beneficial effects or insignificant effects in the competitive market.[29] In short, in order to prevail as a matter of law,[30] a plaintiff must at least show that either (1) a competitor is charging a price below his average variable cost in the competitive market or (2) the competitor is charging a price below its short-run, profit-maximizing price and barriers to entry are great enough to enable the discriminator to reap the benefits of predation before new entry is possible.[31]

It is therefore important to look to the price discriminator's costs, rather than

ny's expenses (fixed as well as variable), and equally efficient competitors would make substantial profits by restricting their output to efficient levels. *See* Areeda and Turner, *supra* note 10 at 709–710.

25. If AMXCO set its price below average cost yet above marginal cost, it might not be profit maximizing. However, prohibiting such behavior could have undesirable effects, for it may not be possible to make a long run profit in the market and a price equal to marginal cost would be loss-minimizing.

26. There would also be insurmountable problems in the enforcement of a prohibition against marginal cost pricing. *Id.*

27. Average variable cost is the costs that vary with changes in output divided by the output.

28. It is conceivable that marginal cost would exceed average variable cost when a firm's output nears its optimum. When this is the case, using the latter as a surrogate for the former enables a firm to sell below marginal cost. However, this exception is justified because when the firm's capacity is strained, predation is especially unlikely. *See id.* at 718.

29. Since AMXCO has considerable market power we need not deal with various pro-competitive justifications, such as promotional pricing, that a firm with considerably less market power might reasonably employ when charging a price below average variable cost.

30. Much of what we say here should be relevant to the requisite elements of a prima facie Robinson-Patman case. Indeed, in *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 696, n. 12, 702, n. 14, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967) the Supreme Court indicated that price below "cost" is perhaps, a necessary element of a prima facie case. However, because the Court repeatedly referred to "deteriorating price structure," the opinion may hold that it is not necessary to show a price below marginal cost in order to make out a prima facie case. To the extent that the opinion stands for the latter proposition, we limit our discussion to the elements necessary to sustain a motion for directed verdict.

31. We employ the profit maximizing standard only because of our deference to a situation in which a monopolist could drive a slightly less efficient firm out of the market by charging a

his competitor's costs, to determine whether the price discrimination was anti-competitive. If a discriminator's price in the competitive market increases his net revenues in the short run, he will have no need to "subsidize" losses in the competitive market with the profits from his other markets.[32]

Evidence of AMXCO's costs was not cogently presented at trial, apparently because neither side considered it important. However, upon exhaustively searching the record, we find that the judge had much of the relevant data before him and we conclude from this data that the court properly denied Vebco's motion. The record indicates that AMXCO's manufacturing division charged its sales division a price for cooler pads which covered total costs, freight charges, and a "slight profit." Its sales division then resold the goods to distributors at a price based upon the distributors' bargaining power and competition in the area. For example, the manufacturing division sold AMXCO's # 1 pad in bulk to its sales division for 29 cents in 1971. The sales division then listed this pad for sale in bulk to distributors at 71 cents. AMXCO's largest discount of 39.25% (at which only one sale was made) produced a profit to the sales division alone of nearly 15 cents a pad. Thus, not only was the manufacturing division operating at a profit, but the

sales division had a gross margin of around 33%. It would appear that AMXCO was selling its cooler pad at a price far above even its average cost.

Moreover, the record indicates that barriers to entry in the cooler pad market were virtually non-existent.[33] Neighborhood hardware store operators could—and did—purchase excelsior wood and hand make their own pads for retail sale. Indeed, the total costs of entering the market on a scale large enough to supply the entire southwestern and far western United States was less than $300,000. The condition of the market and AMXCO's financial data therefore indicate that the price rivalry in the cooler pad market could reasonably be considered pro-competitive and the judge properly denied Vebco's motion.[34]

Finally, we note that, in addition to believing the evidence rebutting Vebco's prima facie case, the jury could reasonably have found that AMXCO established one of the statute's affirmative defenses. The statute provides that even where price discrimination occurs, a discriminator may not be held liable for a violation of the Act if "his lower price . . . was made in good faith to meet an equally low price of a competitor . . . ." 15 U.S.C. § 13(b) (1973). In order to avail itself of this defense, AMXCO need only have shown that its pricing system was a reasonable method

price above its own average cost, but then charge a very high price because of the difficulty of new entry. This standard should be applied only when the barriers to entry are extremely high. The lower the barriers to entry in a market, the closer to marginal cost a monopolist would have to set its price in order for a plaintiff to prevail as a matter of law, for we see no social utility in insuring the survival of inefficient firms where a new entry is possible.

32. The absence of aid from other markets is a determinative factor in evaluating allegedly predatory conduct and, hence, in determining whether a statutory violation has occurred. *See Borden Co. v. FTC,* 381 F.2d 175, 177 (5th Cir. 1967); *Anheuser-Busch, Inc. v. FTC,* 289 F.2d 835, 842 (7th Cir. 1961).

33. We are considerably oversimplifying the barrier to entry discussion. *See* Markovits,

Fixed Input (Investment) Competition and the Variability of Fixed Inputs (Investment): Their Nature, Determents, and Significance, 24 Stan. L.Rev. 507 (1972). However, all of the relevant data, including a low minimum efficient scale of operation, significant ability to attract customers of other manufacturers, availability of raw materials, etc., suggest a very low barrier entry in the cooler pad market.

34. In fact, AMXCO's sales manager testified it was never his company's policy to undercut Vebco's price "at all costs." Rather, it would appear that AMXCO was profit-maximizing throughout the entire period, for the sales manager testified that it charged the highest price it could and still make the sale. It never sold at a price at which it could not receive a reasonable profit.

of meeting Vebco's lower price. *Callaway Mills Co. v. FTC*, 362 F.2d 435, 442 (5th Cir. 1966). AMXCO need not have shown that its prices were in fact equal to those of Vebco, "but must only [have shown] facts which would lead a 'reasonable and prudent person' to believe that the granting of the lower prices would in fact meet the equally low price of a competitor." [35]

The facts of this case would enable a jury to believe that AMXCO set its price as a reasonable and prudent firm would, to meet Vebco's lower price. As the facts indicate, the cooler pad market was very competitive and buyers often misinformed a manufacturer of a competitor's price in order to induce a larger discont. When AMXCO learned that Vebco had lowered its price, it responded with a price cut which had no result. It then cut its price a second time in order to regain its lost business. Because of the uncertain and competitive nature of the market, the jury could find that AMXCO met its burden under the affirmative defense of meeting competition.

**35.** *Id.* at 443–44. In fact, the Federal Trade Commission has held that the meeting competition defense is available to a seller which beats rather than merely meets the price of a competitor. Matter of Beatrice Foods Co., No. 8663 (F.T.C. Dec. 1, 1969).

**36.** Vebco also challenges the exclusion of other evidence. For example, the court refused to admit a section of Southwest's president's deposition in which he indicated that AMXCO had previously merged with or acquired four companies. All of the alleged acquisitions occurred before 1960. Vebco admits that this testimony appears "rather innocuous" and we agree. The excluded testimony only indicates that AMXCO did not manufacture cooler pads prior to its acquisition of the other companies. Moreover, the acquisitions are of so little temporal relevance to the damage to Vebco that we believe their exclusion was proper. *See, United States v. Maryland and Virginia Milk Producers Ass'n*, 20 F.R.D. 441 (D.D.C.1957).

The trial judge also excluded evidence of AMXCO's purchase negotiations with Southwest. Vebco claims that the evidence would have convinced the jury that AMXCO was attempting to monopolize when it later negotiated to purchase Vebco. The record reveals that AMXCO made only the most superficial inquiry into the acquisition of Southwest and, in

## III.

◼ Vebco next argues that the lower court erroneously excluded evidence relating to AMXCO's "specific intent" to monopolize the cooler pad market. Vebco's principal contentions focus upon the trial judge's exclusion of a series of internal AMXCO memoranda and evidence of specific prices AMXCO charged outside the El Paso area.[36]

◼ Between September 24, 1971, and November 19, 1971, various employees and officers of AMXCO exchanged internal memoranda regarding a source of wood for cooler pad production. All of these memoranda were circulated subsequent to the 1971 cooler pad season and, hence, after most of the alleged injury Vebco complains of in this case. Indeed, the memoranda were written after this suit was filed. When Vebco attempted to introduce the memoranda as evidence of AMXCO's "predatory intent," the judge excluded the proffered evidence on grounds of materiality, saying:

addition, Vebco initiated its purchase negotiations with AMXCO and AMXCO refused to buy Vebco. In context, then, we do not believe that the district judge abused his discretion since the excluded evidence shows little, if anything, about AMXCO's "intent."

Vebco also takes issue with the district judge's exclusion of evidence that AMXCO penetrated the California market by selling to California manufacturers more cheaply than the manufacturers themselves could make cooler pads. We believe that this activity was socially and economically justifiable and deem it irrelevant to a showing of "intent."

Finally, Vebco claims that the trial judge abused his discretion in failing to admit a hearsay statement allegedly made by an AMXCO employee. Inasmuch as the witness through whom the statement was to be introduced could not identify the declarant, making it impossible for AMXCO to rebut the allegation, we believe the district court committed no error. Moreover, even if error was committed in the exclusion of this piece of evidence, we believe that when considered in light of the admitted evidence, that the substantial rights of Vebco were not affected and any error was therefore harmless. Fed.R. Civ.P. 61.

There was nothing in there—they said—if they don't want the wood we'll buy it. That's all right . . . it was all above board.

Vebco now contends that this exclusion, standing alone, is reversible error.

A fair reading of the memoranda supports the district judge's conclusion. The second memorandum indicates that Vebco had ordered wood from a contractor but had refused to take shipment. The memorandum queried whether AMXCO could purchase the wood in order to relieve its own shortages. However, the memorandum noted that AMXCO should proceed carefully in view of the litigation then pending and that Vebco should be given every opportunity to purchase the wood before AMXCO made an offer. The third memorandum said that Vebco had clear title to the wood and that AMXCO would be unable to purchase it, in view of the contractor's business relationship with Vebco. The memorandum did note that AMXCO should inquire the following spring as to the possibility of purchasing the contractor's entire output for use in AMXCO's Fresno operation. The final memorandum contains the two sentences upon which Vebco bases its argument:

> With reference to the question raised in your last paragraph, I feel that it would be very much in order for you to make a trip to Luna and discuss the possibility of obtaining Reynold's total output of wood for Fresno. This would not only relieve the pressure on Englewood and Cedar City to supply wood to Fresno, but it would also deprive Vebco of their present source of wood and possibly make it rather difficult for them to continue their operation.

■ It would appear that the memoranda are of so little probative value that the district judge's exclusion was not an abuse of discretion. However, even assuming an error was committed, we do not believe it was of such magnitude as to require reversal. On appeal, errors during the course of a trial which do not affect the substantial rights of the parties are to be disregarded. Fed. R.Civ.P. 61; *see Connolly v. Farmer*, 484 F.2d 456 (5th Cir. 1973); *United States v. Heyward-Robinson Co.*, 430 F.2d 1077, 1083 (2nd Cir. 1970); *Bell v. Swift & Co.*, 283 F.2d 407 (5th Cir. 1960). In the context of the other evidence submitted in this lengthy and complex trial—and particularly when compared with the other admitted memoranda—the excluded memoranda would have been only a minor piece of evidence, highly unlikely to have changed the result. Therefore, any error committed in the exclusion of the memoranda was harmless. *See United States v. Heyward-Robinson Co.*, 430 F.2d 1077, 1083 (2nd Cir. 1970).

■ The trial judge also excluded evidence of the specific prices charged by AMXCO in about two dozen cities over a three-year period. At trial, AMXCO stipulated that its prices in the El Paso area were different from those charged elsewhere during the relevant period. Likewise, both Vebco's and AMXCO's witnesses repeatedly informed the jury that AMXCO's prices were higher outside the El Paso area. Nevertheless, when the trial judge excluded the exact dollar and cent figures charged elsewhere, Vebco's counsel appeared to argue that the jury simply would not believe AMXCO's prices were higher elsewhere unless it saw the exact figures, and, that Vebco's Robinson-Patman Act claim would therefore be jeopardized. Vebco now assigns the trial court's decision as error, claiming that it affected both the Robinson-Patman Act and Sherman Act claims. In essence, Vebco argues that without the exact numerical data, it was impossible to show that AMXCO was engaged in predation by supporting its price cuts in El Paso with higher prices elsewhere.

We do not agree. Vebco certainly had the right to establish price differentials between AMXCO's prices in El Paso and those elsewhere, *Cornwell Quality Tools Co. v. C. T. S. Co.*, 446 F.2d 825 (9th Cir. 1971), an opportunity of which it availed itself. But we see no merit in requiring a district court to permit the introduc-

tion of exact dollar figures, since aid from other markets, if present in this case, could be established merely by showing that a higher price was charged elsewhere. Moreover, as we have explained, a price differential alone would not show predation; unless AMXCO was selling below marginal cost, it would have no need of aid from other markets and the dollar figures elsewhere would therefore be irrelevant.

## IV.

 Vebco also contends that the district court erred in its instructions to the jury, some of which "effectively increased the plaintiffs' burden of proof." In evaluating the adequacy of a charge to the jury, we consider the charge as a whole, and if the instructions taken together properly express the law applicable to the case, "there is no just ground of complaint, even though an isolated and detached clause is in itself inaccurate, ambiguous, incomplete, or otherwise subject to criticism." *Delancey v. Motichek Towing Service, Inc.*, 427 F.2d 897, 901 (5th Cir. 1970) *quoting Nolan v. Greene*, 383 F.2d 814, 816 (6th Cir. 1967).

 Only two of the alleged errors in the jury charge merit extensive discussion.[37] First, Vebco assigns as error the trial judge's instruction that the phrase "may be substantially to lessen competition" means "a reasonable probability or possibility, not imaginary or elusive, of lessening competition must exist

in order for there to be a 'substantial lessening.'" Vebco argues that the definition given requires a higher standard of proof than the proper definition which includes only the phrase "reasonable possibility" of lessening competition.

While the Supreme Court has never specifically forbidden the "probability" construction, it has employed the "reasonable possibility" language. *See FTC v. Morton Salt Co.*, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). Since that time, a controversy has raged over the doctrinal formulation of the requisite inimical potential. In 1959 the Second Circuit opted in favor of "substantially probable," *see Standard Motor Products, Inc. v. FTC*, 265 F.2d 674, 676 (2nd Cir. 1959), *cert. denied*, 361 U.S. 826, 80 S.Ct. 73, 4 L.Ed.2d 69 (1959), but the Tenth Circuit has approved the "reasonable possibility" formulation, *see Atlas Building Products Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 952 (10th Cir. 1959), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960). Indeed, courts have frequently employed "possibility" and "probability" together as the district court did here. *See, e. g., Anheuser-Busch, Inc. v. FTC*, 289 F.2d 835, 841 (7th Cir. 1961); *Minneapolis-Honeywell Regulator Co. v. FTC*, 191 F.2d 786, 792 (7th Cir. 1951), *cert. dismissed*, 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245 (1952). The vacillation between the standards has even prompted one commentator to conclude that the verbal distinction between the two phrases "has

---

**37.** In addition to the alleged errors discussed in the text, Vebco complains of other irregularities in the jury charge. Vebco claims that the trial court should have instructed the jury with respect to the purpose of the antitrust laws. We believe that the district court was correct in merely explaining the laws to the jury, since the charge apprised the jury of the meaning of the laws and fairly presented the issue to them. Vebco also claims that the district court erred by instructing the jury as to the meaning of "monopolize" and "attempt to monopolize." Since Vebco was suing AMXCO under Section 2 of the Sherman Act, which prohibits attempts to monopolize, we hardly think it error for the judge to have defined the relevant terms for the jury's benefit.

Lastly, Vebco argues that the district court erred in failing to instruct the jury on the proper consideration of the parties' stipulation. The court instructed the jury that "[s]tipulations are facts which are stipulated to and agreed to by counsel, that have been read to you and will be accepted by you as the evidence, and it is agreed to as being considered as facts by you. Of course, you determine, again, what weight should be given to it." We believe, in the context of the entire charge, that the court did not err in giving this instruction. *See Worden v. Tri-State Ins. Co.*, 347 F.2d 336, 343 (10th Cir. 1965). Moreover, the stipulation as read to the jury said, "[t]he following facts . . . are to be taken as true by the Members of the Jury."

become an empty quibble without·operational significance." *See* F. Rowe, *supra* at 136.

 We believe that any difference between the two formulations is trivial. At any rate, the use of the disjunctive by the district court ("reasonable probability or possibility") would give the plaintiff the benefit of the arguably lesser standard.

 Finally, Vebco claims the district court inconsistently defined the relevant geographic market, thus materially misleading the jury. Vebco contended that the relevant market was an issue for the jury, while AMXCO claimed that the relevant market was only the El Paso area. In his charge, the district court first said that the market was a question of fact to be determined by the jury and repeatedly referred to the relevant market as the area in which the two parties competed. However, later in the charge when discussing the Sherman Act count, the court appeared to instruct the jury that the relevant market was the El Paso area as a matter of law. While such an apparent inconsistency could mislead the jury, we do not believe, under the facts of this case, that any error committed would "affect the substantial rights of the parties." Fed.R.Civ.P. 61. As we have indicated, the judge properly excluded, for various reasons, virtually all the evidence presented which dealt with AMXCO's actions outside the El Paso area. The only evidence relevant to this point which the judge admitted was the stipulation and testimony to the effect that AMXCO charged higher prices in other areas than in El Paso. In this context, then, it is difficult to ascertain any damage to Vebco caused by the charge. If Vebco could not even prove antitrust violation in the El Paso area to the satisfaction of the jury, it is highly dubious whether an allegation of monopolizing a greater area—in the absence of evidence of actions outside of El Paso—would have improved its position. We therefore believe any error committed was harmless.

We have carefully reviewed appellant's other assignments of error and we find them meritless.

Affirmed.