**U.S. PHILIPS CORPORATION and North American Philips Corporation, Plaintiffs,**

v.

**WINDMERE CORPORATION and Izumi Seimitsu Kogyo Kabushika Kaisha, Defendants.**

**No. 84–2508–CIV.**

United States District Court, S.D. Florida.

June 8, 1987.

Forrest A. Hainline, III, Timothy A. Ngau, Swidler & Berlin, Washington, D.C., for plaintiffs U.S. Philips and N.A. Philips.

D. Dennis Allegretti, Allegretti, Newitt, Witcoff & McAndrews, Ltd., Chicago, Ill., for plaintiffs U.S. Philips and N.A. Philips.

Michael J. Cappucio, Fowler, White, Burnett, et al., Miami, Fla., for third party defendant N.V. Philips and plaintiffs U.S. Philips and N.A. Philips.

William E. Willis, Gerrard R. Beeney, Sullivan & Cromwell, New York City, for third party defendant N.V. Philips.

Edward Foote, James Vogler, Winston & Strawn, Chicago, Ill., for defendants Windmere and Izumi.

Gary Jones, Hornsby & Whisenand, Miami, Fla., for defendants Windmere and Izumi.

## ORDER

MARCUS, District Judge.

THIS CAUSE came before the Court during the course of a jury trial upon the motions of U.S. Philips Corporation ("USP"), North American Philips Corporation ("NAPC") and N.V. Philips Gloeilampen Fabrieken ("NVP") for a Directed Verdict as Counterdefendants (USP and NAPC) and Third Party Defendant (NVP) on Counts I and II of Windmere Corporation's ("Windmere") and Izumi Seimitsu Kogyo Kabushika Kaisha's ("Izumi") Counterclaim against USP and NAPC, and third party claim against NVP. On April 17, 1986, at the close of Windmere's antitrust case, USP, NAPC and NVP moved for a directed verdict on Windmere's counterclaim. At that time, Windmere withdrew its claims under the Robinson-Patman Act (Count III), Florida State Law (Count V) and the Clayton Act (Count VII). The Court heard oral argument on the remaining claims under Sections 1 and 2 of the Sherman Act on that date. Subsequently all parties submitted supplemental memoranda addressing the remaining counts, as well as questions raised by the Court at oral argument.

■ In their supplemental memorandum, USP and NAPC alleged that they were entitled to a directed verdict because Windmere had failed to offer substantial evi-

dence that Norelco sold its Model 1320 and 1615 razors below average variable cost and that any evidence it had offered was insufficient to avoid a directed verdict. NVP alleged in its supplemental memorandum that Windmere had failed to offer substantial evidence that NVP had monopolized or attempted to monopolize any relevant market or that NVP and Norelco were separate entities capable of conspiring under § 1 of the Sherman Act. In response, Windmere claimed that it did not have to show that Norelco maintained its monopoly by predatory acts in order to prove its monopolization claim, or alternatively, that if proof of predatory acts was necessary, that Windmere had produced sufficient evidence of them to withstand a directed verdict motion. Reluctantly we found that Windmere had failed to present substantial evidence sufficient to create a jury question on at least one element of its antitrust claims—the willful acquisition or maintenance of monopoly power via predatory pricing[1]—and accordingly we granted USP, NAPC and NVP's motions for a directed verdict in open court on April 22, 1986. On April 22, 1986, a jury returned a verdict for Plaintiffs on their patent infringement claim and for Defendants on the unfair competition claim. We revisit the directed verdict motions now to set forth our reasons for granting them in detail.

## I. THE PARTIES

USP is a Delaware corporation which holds intellectual property rights. NAPC is a Delaware corporation which is engaged in a diversified line of commerce. It is a publicly held corporation with stock traded on the New York Stock Exchange. One of its divisions has been selling electric razors (foil) since 1948 and rotary electric razors since 1963. The brand name for the rotaries is Norelco. NVP is related to NAPC in the following way: NVP is a Netherlands corporation wholly owned by the shareholders of N.V. Gemeenschappelijk Bezit van Aandelen Philips' Gloeilampenfa-

bricken ("Bezit"), a Netherlands corporation. Bezit is the beneficiary of United States Philips Trust, which holds 60% of the common stock of NAPC. Answer of NVP to Amended Third Party Complaint, at 2, Para. 4.

Windmere is a Florida corporation engaged in various lines of commerce in the United States. Windmere began marketing rotary razors under the Ronson trade name in 1984. Izumi is a Japanese corporation which manufactures and sells electric razors to Windmere.

This action was commenced in October 1984 with the filing of a Complaint by Plaintiffs USP and NAPC against Windmere and Izumi for patent infringement and unfair competition. The essence of the Complaint was that Windmere's Ronson rotary razors violated Plaintiffs' patents on Norelco rotaries, and that Windmere created confusion among consumers by marketing the Ronson razor to appear as if it were nearly identical to the Norelco rotaries. While the patent infringement claim was directed against both Windmere and Izumi, the unfair competition claims were directed only at Windmere.

Izumi counterclaimed against USP and NAPC seeking declaratory judgment concerning U.S. letters Patent No. 4,227,301, which was the patent purportedly infringed by Izumi. Izumi contended that the patent issued was invalid. Windmere counterclaimed against USP and NAPC, Plaintiffs, and against NVP as a third party defendant. The only remaining counts were Counts I and II. Count I was brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, and alleged an unlawful attempt by USP, NAPC and NVP to monopolize, and monopolization of the electric shaver market and the rotary shaver submarket in the United States. Count II alleged a conspiracy to restrain trade in the electric shaver market and rotary submarket between NAPC, USP, and NVP.

---

**1.** The failure to prove predatory pricing is also fatal to Windmere's Section 1 claim against NVP. *See Matsushita Electric Industrial Co. v.* *Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (Section 1 case which alleged predatory pricing).

## II. DIRECTED VERDICT STANDARD

The standard to be applied to a directed verdict motion has been stated by the Eleventh Circuit as follows:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*L.A. Draper & Son, Inc. v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 419–20 (11th Cir. 1984), *aff'd in part and rev'd in part on other grounds*, 813 F.2d 332 (11th Cir.1987) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1976) (en banc)).

In order to withstand a directed verdict motion, the non-moving party must present *substantial evidence* sufficient to create a jury question with respect to each element of its claim. *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 848 (5th Cir.1981), *cert.*

*denied*, 454 U.S. 1125 (1981). "Unsupported, self-serving testimony is not substantial evidence sufficient to create a jury question." *Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir.1979) (citations omitted). "Similarly, inferences cannot stand in the face of uncontradicted and substantial evidence to the contrary." *Id.* (citation omitted).

USP, NAPC, and NVP acknowledged the strict standard for a directed verdict yet strongly urged that a directed verdict was appropriate because Windmere had failed to present substantial evidence sufficient to create a jury question primarily on its predatory pricing allegations.

As we have noted, Counts I and II alleged a monopoly, an attempt to monopolize and restraint of trade against USP, NAPC and NVP. Windmere alleged that NVP was the parent of USP and NAPC and that the three corporations were really a single economic unit acting in violation of Section 2 of the Sherman Act. Alternatively, Windmere alleged that NVP conspired with USP and NAPC in violation of Section 1 of the Sherman Act. While NVP moved separately for a directed verdict in its favor, many of the same arguments advanced by USP and NAPC applied to NVP as well.[2]

## III. THE SHERMAN ACT

■ In *United States v. Grinnell Corp.* the Supreme Court stated that a Section 2 Sherman Act violation consists of the following elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966). Moreover, to establish an attempt to monopolize, the plaintiff must show a specific intent to monopolize and a dangerous probability of achieving a monopoly in the relevant market.

**2.** Thus, we shall refer to USP, NAPC, and NVP collectively as "Philips" hereinafter.

As we noted in our summary judgment Order of April 8, 1986, the crucial issue in antitrust analysis often is a determination of the alleged monopolists' market power. Furthermore, the threshold fact question in determining market power is definitional—what is the relevant market. *See, e.g., Grinnell,* 384 U.S. at 570–71, 86 S.Ct. at 1703–1704. In accord with the importance of these determinations, Windmere presented a substantial amount of evidence to support its definition of the relevant market and to show that USP, NAPC and NVP had market power in this market. Windmere's memorandum in opposition to the directed verdict motion entitled "Windmere's Theories of Liability" also thoroughly covered these arguments. Market power, however, is not the sole element of a Sherman 2 violation. Although Windmere claimed at oral argument that the Sherman Act "prevents monopoly," this is simply not so. As is clear from the *Grinnell* test, the Sherman Act prohibits only those monopolies that are *willfully* acquired or maintained as distinguished from those that result from a superior product, business acumen or historic accident. Thus, even assuming that USP, NAPC, and NVP had market power in Windmere's proposed relative market, as we did for purposes of this motion, Windmere still had to prove the "willfulness" or intent element in order to meet the requirement that it present substantial evidence on each element of its claim. Accordingly, it is the evidence with respect only to this element of a Sherman 2 violation that we shall review.

### A. *Monopolistic Intent*

■ Specific intent to monopolize is an element of an attempt to monopolize claim under § 2, but in cases of actual monopolization, the intent required under § 2 is a general intent—a specific intent need not be proved. "The [requisite specific] intent must be to do more than compete vigorously; vigorous competition is precisely what the antitrust laws are designed to foster."

*Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.,* 735 F.2d 884, 887 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985). Accordingly, in this Circuit[3], "[a] statement of intent to compete ... even if perceived as a threat, is not unlawful. Such a manifestation of intent to triumph in the competitive market, in the absence of unfair, anti-competitive or predatory conduct, is not enough to establish an antitrust violation." *Hayes v. Solomon,* 597 F.2d 958, 977 (5th Cir. 1979) (footnote and citations omitted), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). "Rather, the forbidden specific intent is that of acquiring and exercising 'the power to fix prices or to exclude competition.'" *Adjusters Replace-A-Car, Inc.,* 735 F.2d at 887 (quoting *United States v. du Pont & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004–1005, 100 L.Ed.2d 1264 (1956)).

■ The less stringent standard of general intent is met where a business which possesses monopoly power "undertakes a course of action the consequences of which would be to destroy or exclude competition, or if monopoly results as the inevitable consequence of its conduct." *3 Von Kalinowski, Antitrust Laws & Trade Regulation* § 8.02[4] (1986). If a business' conduct is unlawful, or in context evidences a willful, deliberate or conscious acquisition or retention of monopoly power, a general intent to monopolize will be inferred. *Id.* Because Windmere has made both monopolization and attempted monopolization claims, each of which has a different intent standard, we evaluated only the monopolization claim, which carries with it the less rigorous general intent standard, in determining whether Windmere offered the substantial evidence necessary to withstand a motion for a directed verdict.

### B. *Predatory Pricing Standards*

The specific conduct which Windmere alleged was anticompetitive and showed Phil-

---

**3.** In *Bonner v. City of Prichard,* the Eleventh Circuit adopted as binding precedent those decisions rendered by the former Fifth Circuit prior to October 1, 1981. 661 F.2d 1206 (11th Cir. 1981).

ips' intent to monopolize, was Philips alleged predatory pricing scheme with regard to the sale of its model 1320 and 1615 rotary electric razors. As has been noted by the Supreme Court recently, however, predatory pricing, by either a single firm or as a conspiracy, is by its nature very speculative. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1357–58, 89 L.Ed.2d 538 (1986). It requires a company or companies to sacrifice present revenues in the expectation of greater future gains. For this risk to be rational, the company or companies must have a very substantial prospect that the losses they incur will be exceeded by the monopoly profits to be earned after rivals have been destroyed. *Id.; see* P. Areeda & D. Turner, *Predatory Pricing & Related Practices Under Section 2 of the Sherman Act*, 88 Harv. L. Rev. 697, 698 (1975) (hereinafter "Areeda & Turner"). "Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, '[t]he predator must make a substantial investment with no assurance that it will pay off.'" *Matsushita*, 106 S.Ct. at 1357 (quoting Easterbrook, *Predatory Strategies and Counterstrategies*, 48 U. Chi. L. Rev. 263, 268 (1981)). Repeated predation is often necessary to destroy new entrants, too. Such a strategy is costly, easy to detect and subject to severe sanction. Areeda & Turner, at 699. Consequently, the prospects of an adequate future payoff will seldom be sufficient to motivate predation. *Id.* Thus, "predatory pricing schemes are rarely tried, and even more rarely successful." *Matsushita*, 106 S.Ct. at 1357–58 (citations omitted).

■ We are constantly reminded that the antitrust laws are designed and intended to protect and promote competition. Price cutting between competitors as a general rule is precisely the type of conduct our laws are designed to promote. Only when that behavior becomes predatory, that is when the price cutting scheme falls below some measured standard, does it become actionable. Therefore, due to the rarity with which true predatory schemes arise, it is important to carefully define this wrongful conduct, so as not to punish properly competitive behavior. And it is critical that the facts in a particular case be carefully examined and measured against the appropriate standard. As has been noted by the Fifth Circuit, judicial use of the term "predatory intent" is troublesome because several cases hold that a court may infer its existence from a finding of certain actions. *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 722 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed. 2d 349 (1976). Yet, predatory intent has never been clearly defined. The Supreme Court has stated that "predatory pricing" means pricing below some measure of cost, however, it has not determined which "cost" is relevant. *Matsushita*, 106 S.Ct. at 1355 n. 8. The Fifth Circuit, however, has made such a determination. It has stated that in order for a plaintiff to prevail as a matter of law on a predatory pricing claim, it must show that either:

(1) a competitor is charging a price below his average variable cost in the competitive market or (2) the competitor is charging a price below its short-run, profit-maximizing price and barriers to entry are great enough to enable the discriminator to reap the benefits of predation before new entry is possible.

*International Air*, 517 F.2d at 724 (footnote omitted).

The court chose average variable cost as the appropriate measure as a result of the following analysis. First, the incremental cost of making and selling the last unit (marignal cost), the truly appropriate cost measure, is often difficult to calculate from conventional business accounts. Areeda & Turner, at 716. Thus, average variable cost,[4] which is easier to calculate, may be substituted for marginal cost in a predatory pricing analysis. *Id.* at 717–18, *see International Air*, 517 F.2d at 724. Second, marginal cost was chosen, even though prices at or above it are not necessarily profit-maximizing, because at the

---

4. Average variable cost is the costs that vary with changes in output divided by the output.

point where price equals marginal cost, only less efficient firms will suffer larger losses per unit of output than the alleged monopolist; more efficient firms will be losing less or operating profitably. Areeda & Turner, at 711. "Establishing a price floor above marginal cost would permit survival not only of equally efficient firms, but less efficient ones as well.... [T]o force the firm to charge a higher price would reduce industry output and waste economic resources in the short run.... Thus, pricing at marginal cost is the competitive and socially optimal result." *Id.* at 711. Thus, in order for Windmere to withstand a directed verdict motion it must have presented substantial evidence that Philips priced the model 1320 and 1615 razors (1) below average variable cost or (2) below its short-run, profit-maximizing price (average variable cost) and that barriers to entry are great.[5] Because the easier to meet of these two standards requires proof only of pricing below average variable cost, this is the standard we shall evaluate Windmere's evidence against.

## IV. EVIDENCE ADDUCED AT TRIAL OF PREDATORY PRICING

■ The disputes regarding the evidence Windmere introduced to prove predatory pricing involve two primary issues: (1) the proper allocation of Philips advertising expenditures, and (2) the proper method of proving costs—i.e., by using actual costs or projections.

It is undisputed that if all of Philips advertising expenditures are classified as fixed costs, that Philips prices for the model 1320 and 1615 razors exceeded their average variable cost. Windmere, however, claimed that "Norelco's records treated all advertising as "variable costs." Windmere's Theories of Liability, at 10. Windmere, however, has failed to cite to any

record evidence to support this statement. Rather, Windmere has cited to legal authority which indicates that in specific cases, courts have found advertising to be a variable cost.

Variable costs, as defined, are costs that vary with changes in output. Areeda & Turner, at 700. Thus, to determine whether a cost is fixed or variable, a court must look at the business plans and records of the particular business before it—generalizations simply cannot be made effectively. In the instant case, Philips offered the expert testimony of Mr. Kamerschen on this very subject. Mr. Kamerschen testified that based on his review of Norelco's business and media plans, which he stated contained the type of information an economist would generally rely upon in order to make a judgment of this kind, that Norelco's advertising was a fixed cost. (Tr. 2618–2623). Windmere failed to bring forth any information to the contrary on the cross-examination of this witness.

The only evidence which Windmere pointed to at oral argument on this motion in support of its position were 1984 income statements of Norelco which listed advertising in a category entitled variable expenses. (Tr. 2429). It is clear that such an accounting record cannot alone support the classification of advertising as a variable expense for economic purposes. As noted by Areeda and Turner:

Marginal, variable, and full costs are economic concepts used to study markets. Financial statements and accounts, on the other hand, are prepared by accountants to aid management in operating the business and also to guide shareholders and other investors. For this reason, the court cannot simply turn to the defendant's financial statements to find the marginal, variable, or full costs relevant for cost based predatory pricing rules.

5. *International Air Industries* suggests that a short-run profit-maximizing price is equal to average variable cost. If this is so, we fail to see how this additional test provides an alternative measure of predatory pricing other than to add the requirement of high entry barriers. If the profit-maximizing price is actually intended to be something greater than average variable cost,

we note that this test has been criticized by other courts and has not actually been imposed by any circuit. *See, e.g., Southern Pacific Communications Co. v. American Telephone & Telegraph Co.,* 556 F.Supp. 825, 964 (D.C.Cir. 1982), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985).

Areeda & Turner. *Antitrust Law* ¶ 712.1, at 359 (1986 Supp); *see Janich Bros. Inc. v. American Distilling Co.*, 570 F.2d 848, 858 (9th Cir.1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978) (affirmance of directed verdict where plaintiff presented evidence of prices below cost of merchandise sold rather than average variable cost). Accordingly, we find that Windmere did not present any competent evidence, much less substantial evidence, to support its claim that Norelco's advertising was a variable expense.

Even assuming, however, that advertising expenses here are properly characterized as variable costs, there is a question whether cooperative advertising support given to Norelco by NVP should be deducted before determining whether Norelco priced the 1615 and 1320 below its average variable cost. NAPC claimed to have received $6,580,000 in advertising support from NVP in 1985. If this amount is properly deducted, then even according to the testimony of Windmere's Vice President of Finance, Burton Honig, Norelco achieved a profit on the sale of the 1320 and 1615 in 1985. (Tr. 2096). Windmere claimed, however, that although this money was earmarked by NVP to be paid to Norelco, that it was never actually paid (Tr. 2425), or alternatively, that this sum was in addition to, rather than part of, the $17.5 million spent by Norelco for advertising in 1985. (Tr. 2424–2425). A review of the record evidence shows that Norelco actually spent $17,558,000 for advertising in 1985 and that $6.6 million of this amount was paid to it by NVP. (Tr. 2451–2452; Defendants' Exhibits 931, 932, 933; Plaintiffs' Exhibit 16). Consequently, we must reject Windmere's wholly unsupported contention.

Windmere next contended that the 1985 receipts for the 1615 and 1320 do not cover average variable costs when advertising expenses are allocated to these models on a per unit basis.[6] Philips responded that advertising should be allocated on the basis of revenue received, and that using this method, total receipts for the 1615 and 1320 exceeded average variable costs. We can find no record evidence to support either method of allocation. Although Windmere claimed that Norelco allocated on a per unit basis (Tr. 2428), Philips denied this allegation. (Tr. 2446). Because Windmere had the burden of proof on this issue, we cannot say that it should be able to reach a jury on this contention in the absence of substantial evidence which supports its position.

Furthermore, we find that there is no record evidence which shows that any advertising expenses were incurred specifically for the 1615 and 1320. Windmere claimed that the ads were geared toward the sale of three-headed rotary shavers in general and presumably toward the 1615 and 1320. (Tr. 2431). Philips' exhibits, in contrast, showed that these two models were not nationally advertised. (Plaintiffs' Exhibits 18, 205). Thus, it appears to us, that there is no evidence to suggest that advertising expenses should not be allocated across the full Norelco line of shavers rather than just to the 1615 and 1320. Consequently, we find that Windmere has not presented substantial evidence on this issue.

Finally, we must consider the type of evidence Windmere has offered to support its allegations. As discussed earlier, predatory pricing is very speculative and in most situations, irrational. As a result, a party attempting to prove such allegations bears a heavy burden. The Supreme Court has recently suggested that "[a]s a practical matter, it may be that only direct evidence of below-cost pricing is sufficient to overcome the strong inference that rational businesses would not enter into [such activities]." *Matsushita*, 106 S.Ct. at 1355 n. 9. It is with these concerns in mind that we evaluate Windmere's evidence.

---

**6.** For purposes of this argument, we have considered 1985 advertising expenses to have been $17,558,000. This amount includes the $6.6 million contribution which, as noted previously, we believe should be deducted for purposes of this average variable cost analysis. However, because we wish to evaluate Windmere's arguments independently from one another, we have included this sum, as have all parties in reviewing this contention.

Windmere admitted that its evidence of the cost of batteries, freight, and handling was based on *projections* of the 1985 year. Windmere's Theories of Liability, at 12. (Tr. 2484–85). Indeed, there is no record evidence of the actual amounts paid for 1985. Moreover, the record is silent as to whether Norelco paid any amount for batteries or whether batteries were included in the cost of the razors to Norelco. As noted by Philips, when the cost of batteries is eliminated and these other costs are reduced, Norelco's alleged loss becomes a profit. (Defendants' Exhibits 523, 922, 930). Accordingly, we cannot agree with Windmere that these items are "minor." Although some use of projections undoubtedly is necessary, we find that where such use alone makes the difference between a loss or a profit on an item that the use is too extensive. In view of the Supreme Court's admonition on the importance of direct evidence in predatory pricing cases, we find that Windmere's evidence of below-cost pricing does not meet the substantial evidence standard necessary to withstand a directed verdict.

## V. THE NECESSITY OF PROVING BELOW–COST PRICING

Alternatively, Windmere contends that predatory pricing need not be proven in order to prove a § 2 violation. Windmere argued that by lowering their prices on the 1615 and 1320, Norelco intended to destroy Windmere and that such conduct violates the Sherman Act. (Tr. 2413–2414). Windmere relied primarily on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), in making this argument. According to Windmere, in *Aspen* the Supreme Court found the existence of an illegal monopoly where a business refused to continue a joint marketing program—behavior which Windmere characterizes as neither pernicious nor predatory. We reject Windmere's reading of *Aspen*. *Aspen* involved the question whether one ski company had a duty to continue a joint marketing program for lift tickets with another ski company in the Aspen area. After determining that the relevant geographic market was

limited to the Aspen area, that only two companies operated businesses in this area, and that the defendant had market power, the Supreme Court evaluated whether one company had a legal duty to continue to deal with the other company. The High Court began by noting that *"[i]n the absence of any purpose to create or maintain a monopoly,* the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Aspen*, 105 S.Ct. at 2857 (emphasis in original) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)). The Court further noted that evidence of intent was relevant to determine whether the challenged conduct was "exclusionary," "anticompetitive," or "predatory." *Id.* In order to determine whether the *Aspen* defendant's conduct was predatory, the High Court looked at its conduct to see if it was "'attempting to exclude rivals *on some basis other than efficiency.'* " *Aspen*, 105 S.Ct. at 2859 (emphasis added) (quoting R. Bork, The Antitrust Paradox 138 (1978)). After determining that the *Aspen* defendant had no legitimate business justifications for its alleged predatory conduct, the Court found that "the evidence supports an inference that [defendant] Ski Co. was not motivated by efficiency concerns and that it was willing to sacrifice short run benefits and consumer good will in exchange for a perceived long-run impact on its smaller rival." *Aspen*, 105 S.Ct. at 2861–62.

■ A review of *Aspen* makes clear that apparent exclusionary conduct, even by a monopolist, is not per se illegal. Rather the conduct must be evaluated for efficiency justifications. Only where there exists no efficiency justification does such conduct violate the Sherman Act. Although *Aspen* involved a refusal to deal, not predatory pricing as in this case, the underlying standard and rationale remain unchanged. Pricing below average variable cost violates the Sherman Act because, based on sound economic theory, there is no efficien-

cy justification for it. Any price above average variable cost may be supported by an efficiency motivation. Accordingly, we reject Windmere's arguments that *Aspen* did not involve predatory conduct and that Philips' price-cutting alone, without a review of its efficiency, necessarily constitutes a violation of § 2 of the Sherman Act. For the foregoing reasons, it is hereby

ORDERED AND ADJUDGED that USP, NAPC, and NVP's Motions for a Directed Verdict are GRANTED.