764 F.2d 1437
 Ledford GREGORY, Howard Kurzner, Neil J. Rohan and Ronald A.
Gioffre, as Trustees of Gregory, Kurzner and Rohan
Orthopedic Associates, P.A., Pension
Plan and Trust Agreement,
Plaintiffs-Appellants,
v.
MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellee.
 No. 84-5595.
 United States Court of Appeals,
Eleventh Circuit.
 July 9, 1985.
 
 Dwight Sullivan, Miami, Fla., for plaintiffs-appellants.
 Kimbrell, Hamann, Jennings, Womack, Carlson & Kniskern, P.A., Thomas E. Scott, Miami, Fla., for defendant-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HENDERSON and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 TUTTLE, Senior Circuit Judge:
 
 
 1
 Four physicians, Dr. Ledford Gregory, Dr. Howard Kurzner, Dr. Neil Rohan, and Dr. Ronald Gioffre, as trustees of a pension fund for their professional association, appeal from a directed verdict for the defendant, Massachusetts Mutual Life Insurance Company ("the Insurance Company") in a breach of contract action. Because this is an appeal from a directed verdict, the facts will be stated in the light most favorable to the plaintiffs.
 
 
 2
 Early in 1978, Dr. Kurzner had preliminary discussions with Norman Clarke, regional group pension manager in Miami for the Insurance Company. Kurzner told Clarke what the doctors were looking for in a contract. On May 23, 1978, the doctors signed a preliminary application and sent it to the Insurance Company. That one page application stated only that it was for a group pension contract.
 
 
 3
 Some time later, the Insurance Company sent a sample contract to the doctors. Dr. Gregory looked it over, could not understand it, and sent it to the doctors' attorney, Martin Kurzer. Kurzer reviewed it and reported back to Gregory.[1]
 
 
 4
 In July 1978 the Insurance Company sent another sample contract to Bob Crecelias, a financial planner retained by plaintiffs. Crecelias looked at the contract briefly but did not review it.[2] The contract was similar to, but not identical with, the one Kurzer had reviewed.
 
 
 5
 On August 4, 1978, the doctors had a telephone conversation with Clarke. Gregory told Clarke that the sample contract which Kurzer had reviewed did not meet their objectives. He told Clarke that the doctors were looking for a contract which would provide:
 
 
 6
 (1) the ability to get out of the contract at their option;
 
 
 7
 (2) a guarantee that the doctors would get all their money back, principal plus interest, if they terminated the contract; and
 
 
 8
 (3) the highest interest rate they could earn.
 
 
 9
 Clarke replied that he thought the Insurance Company could provide such a contract. He suggested that they meet and discuss it.
 
 
 10
 On August 10, 1978, the doctors met with Clarke. Crecelias and his wife, Sylvia Crecelias, who was also a financial planner, were present as observers. Gregory reiterated the three provisions for which the doctors were looking. Clarke said the insurance company could furnish a contract that would allow the doctors to get back their principal and any interest on it if they withdrew. There would be a slight penalty if the doctors terminated the contract during the first year but not if they terminated after that. Clarke told them that they did not have enough money to qualify for a contract with a guaranteed rate of interest and recommended one with a floating interest rate instead. When the meeting ended, the only item open was the amount of money the doctors would have to place each year with the Insurance Company.
 
 
 11
 On August 22, 1978, the doctors sent a final application to the Insurance Company with a covering letter from Crecelias. The doctors transferred a total of $394,496.79 in pension funds to the Insurance Company in August 1978.
 
 
 12
 In September 1978, Clarke asked the doctors to amend the pension plan to allow it specifically to enter into a group annuity contract. The requested amendment was prepared and sent to the Insurance Company.
 
 
 13
 On October 13, 1978, the Insurance Company issued its group annuity contract. It was similar to the sample contracts the company had sent earlier but differed in some ways.
 
 
 14
 On November 2, 1978, Gary Anderson, who had replaced Clarke as the Insurance Company's representative, wrote a letter to the doctors which contained the following statements:
 
 
 15
 Enclosed is an executed contract. Still in the works are the submitted amendments. We would expect those to arrive within the month.
 
 
 16
 No amendments were received by plaintiffs.
 
 
 17
 The doctors did not see the letter or contract in November 1978.[3] Dr. Gregory testified that he did not ask for a written contract because his experience in dealing with insurance companies had been that the agent would bind the deal. He trusted the agent. If a written contract arrived weeks or months later, he would not read it.
 
 
 18
 Although Clarke had told the doctors at the August 10, 1978, meeting that the Insurance Company would furnish a contract that would allow them to get out at any time and get back principal and earned interest, the contract issued did not contain such a provision. The contract did contain the following provision:
 
 
 19
 Section 4.03. Election by Contract Holder to Liquidate Accounts to Cash.
 
 
 20
 The Pension Account will be liquidated as of the date of Discontinuance of Contributions. The Liquidation Value of the Pension Account will be determined by the Insurance Company by applying thereto the appropriate Liquidation Formulas then in effect....
 
 
 21
 LIQUIDATION FORMULAS are formulas that have been prepared by an actuary of the Insurance Company charged with the responsibility therefor, and are maintained on file with the Secretary of the Insurance Company. Any revisions of a formula will become effective with respect to this Contract 60 days following the date such revised formula is filed with the Secretary.
 
 
 22
 In early 1980, the doctors, dissatisfied with the interest the money was earning, inquired about terminating their contract with the Insurance Company. The Insurance Company responded that the doctors could get their money back and any interest it had earned but that it would be subject to a market value adjustment. In applying a market value adjustment, the Insurance Company did not liquidate any assets and determine actual gain or loss. It simply applied the liquidation formula based on the bond index.
 
 
 23
 The doctors and the Insurance Company terminated their relationship. The Insurance Company returned to the doctors the amount it claimed they were entitled to after first applying a market value adjustment, without prejudice to the doctors suing for the difference between book value of their investment and the amount they received. This difference, $94,005 is the amount claimed in this suit.
 
 
 24
 The sole issue for decision by this Court is whether the district court erred in directing a verdict for the defendant on the ground that no oral contract had been proved. We find that the district court correctly directed a verdict for the defendant and therefore we affirm the decision of that court.
 
 A. Standard of Review
 
 25
 In determining whether there is sufficient evidence to submit a case to the jury following a motion for directed verdict, the district court should consider all evidence and not just evidence supporting the non-mover's case. The evidence must be considered in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not reach a different conclusion, the Court should direct a verdict. Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969); Kaye v. Pawnee Construction Co., Inc., 680 F.2d 1360 (11th Cir.1982).
 
 B. Oral Contract
 
 26
 The plaintiffs' theory of the case is that the evidence, viewed most favorably to the plaintiffs, established a separate promise by the Insurance Company to furnish a contract pursuant to which the doctors would place the pension plan money with the Insurance Company. Under the contract the Company said it would furnish, the doctors could terminate at any time and get back all their principal and whatever interest it had earned.
 
 
 27
 The plaintiffs contend that when a company agent agrees that the company will furnish a contract containing certain rights and guarantees and the person with whom the agent deals relies upon the agent's statements and representations, the company is liable when the contract it issues fails to contain the provisions its agent promised it would contain. Plaintiffs rely on Florida insurance cases, e.g., Peninsula Life Insurance Co. v. Wade, 425 So.2d 1181 (Fla.Dist.Ct.App.1983) (when agent promises full coverage under life insurance policy and policy limits the amount of death benefit during the first three years, company is estopped to deny the coverage claimed); Kramer v. United Services Automobile Association, 436 So.2d 935 (Fla.Dist.Ct.App.1983) (when agent represents that new car is covered under existing automobile policy, company is estopped to deny coverage); Monogram Products, Inc. v. Berkowitz, 392 So.2d 1353 (Fla.Dist.Ct.App.1980) (summary judgment for defendants improper when plaintiff alleges an oral contract to procure insurance on inventory in warehouses and insurance company fails to provide such insurance).
 
 
 28
 In directing a verdict for the defendant, the trial judge stated:
 
 
 29
 It seems to me that there are a number of problems that arise with an oral contract theory. Assuming Dr. Gregory said, "We want these provisions in the contract," and the agent with authority to do something at this point said, "Okay, I'll work that out." This is a very complex contract because you agree on one or two provisions.
 
 
 30
 It seems to me that the contract, the annuity contract overall would fail because of vagueness, indefiniteness, no mutuality perhaps of consideration over the vastness of the contract.
 
 
 31
 There was no prior relationship between the parties that you have in some cases where it is sort of a renewal of an old contract.
 
 
 32
 Defendant contends that the trial judge correctly concluded that there was no oral contract in light of the overwhelming proof that the intent of the parties was to execute a written agreement. According to defendant, the trial court's decision was based on Hornbook principles of contract law: in order that there be a contract, the parties must have a definite and distinct understanding, common to both, and without doubt or difference. Defendant notes that the preliminary application clearly contemplated a written contract which would contain "terms and provisions acceptable to both said insurance company and the applicant." It also points to the final application which stated that a "contract will be prepared by Massachusetts Mutual ... and designated as a group annuity contract ... the terms and conditions of which have been mutually agreed upon between the applicant and Massachusetts Mutual Life Insurance Company." The contract itself provides, "this contract and the application thereof, ... will constitute the entire contract."
 
 
 33
 Defendant argues that the facts, taken in the light most favorable to the plaintiffs, reveal that the doctors made an offer (the purported oral agreement) and that the company rejected it and made a counter-offer (the written agreement). Thus, according to defendant, there was no contract.
 
 
 34
 Defendant contends that the insurance cases cited by plaintiffs are not controlling because this is not an insurance coverage case. Defendant argues that the mere fact that Massachusetts Mutual is an Insurance Company is incidental to the type of contract that it negotiated with the plaintiffs. It points out that this is not a case involving unsophisticated persons, and that plaintiffs had both attorneys and financial advisors to assist them.
 
 
 35
 We agree with the district court that there is insufficient evidence to support the existence of the oral contract alleged by plaintiffs. In so holding we are influenced by "the great weight to be given the determination of local law by the district court in diversity cases." Petrites v. J.C. Bradford & Co., 646 F.2d 1033, 1037 (5th Cir., Unit B, 1981).
 
 
 36
 This policy is grounded in the rationale that a federal trial judge who sits in a particular state and has practiced before its courts is "better able to resolve certain questions about the law of that state than is some other federal judge who has no such personal acquaintance with the law of the state."
 
 
 37
 Cole v. Elliott Equipment Co., 653 F.2d 1031, 1034 (5th Cir, Unit A, 1981), quoting Wright, Federal Courts Sec. 58, at 271 (3d ed. 1976). The district court considered all the evidence in the light most favorable to the plaintiffs and found that the parties contemplated a written agreement and that any oral promises made by the insurance company were too vague to constitute an oral contract on such a complex subject as investment of pension funds. The court found the insurance cases relied on by defendant to be inapplicable to this situation involving a pension investment contract and sophisticated investors advised by both financial planners and an attorney. Having so found, the court correctly directed a verdict for the defendants. Because we affirm the decision of the district court on the ground that no oral contract existed, we need not reach the affirmative defenses raised by defendant.
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 Kurzer raised questions about whether certain provisions of the sample contract, including the liquidation provision, met the doctors' requirements
 
 
 [2]
 It is difficult to understand why Crecelius, who had been retained by the doctors to make inquiries of insurance companies concerning potential investments, did not review the sample contract. He testified that he "looked at it just very briefly" and "expressed an opinion [to the doctors] that that was not what they wanted." When asked why he did not review the contract, he explained that that was the attorney's job and that his job was solely to get information for the doctors
 
 
 [3]
 In 1980, after the dispute arose about withdrawal from the contract, the doctors searched their files and found the letter, but not the contract